**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| **Raymond Capuano** | : | |
| | : | |
| **v.** | : | **3:03cv1572 (JBA)** |
| | : | |
| **Island Computer Products,** | : | |
| **Inc. et al** | : | |

**Ruling on Defendants' Motion for Summary Judgment [Doc. # 49]**

Defendants, Island Computer Products, Inc. ("ICP"), Louis Esposito, and Paul Fabozzi, Sr. move for summary judgment on all counts in plaintiff's complaint.[1]  For the reasons discussed below, defendants' motion is GRANTED in part and DENIED in part.

**I.  Background**

This suit arises from plaintiff Raymond Capuano's termination from his position as Senior Vice President for Professional Services Sales at ICP, "a strategic solution provider[] of Enterprise Services and Information Technology products."  Position Description [Doc. # 53, Ex. 1]. Defendant Esposito is Chief Information Officer (CIO) of ICP and Capuano's direct supervisor, and defendant Paul Fabozzi is the founder and former owner of ICP.  See Deposition of Louis Esposito [Doc. # 53, Part 4] at 4-5, Deposition of Paul Fabozzi [Doc. # 53, Part 4] at 6.

---

[1]The counts include breach of contract, breach of the implied covenant of good faith and fair dealing, defamation, negligence, negligent misrepresentation, fraudulent inducement, and a statutory wage claim under Conn. Gen. Stat. § 31-72.

Capuano was first recruited in 2002 by ICP's Senior Technical recruiter, Russell Pinto, for a position as Vice President of Professional Service Sales at ICP, with the expectation that he would "develop and direct a team of client executives who will sell professional service engagements to the Fortune 1000 or government organizations in the tri-state area," generating "$20-30 million in revenue."  Position Description [Doc. # 53, Ex. 1]; see also Esposito Dep. at 50; Deposition of Raymond Capuano [Doc. # 53, Part 3] at 176.  As ICP had been receiving $10 million in revenue annually from its professional services, it hoped that the new Vice President would be able to generate at least an additional $10 million in revenue each year. See Esposito Dep. at 49; Capuano Dep. at 219-20; 232-33.  ICP sought candidates with at least 10-15 years experience in "management and development of staff, account management, direct sales, and monitoring or budgets and goal attainment," who had the "ability to build relationships at the highest levels of customer organizations."  Position Description at 3.  Esposito gave the ICP recruiters "orders to look for a VP," and testified in his deposition that if he had seen on a resume or learned during the interview that the candidate held the title of "sales executive," and not Vice President, then "he would have been disqualified," because Esposito "was looking for a VP or higher to lead an effort."  Esposito Dep. at 116, 128.

2

Prior to joining ICP, Capuano was employed at Electronic Data Systems (EDS), and when he was first contacted by ICP recruiters in the summer of 2002, he declined to leave his EDS position to pursue the ICP opportunity.  When contacted for a second time in 2002, however, Capuano expressed interest in ICP, and submitted his resume.  While he had been a Vice President at EDS when first contacted by ICP, he had been moved to a strategic sales account executive position when ICP contacted him the second time.  Capuano Dep. at 100.  He explained that he changed his mind about leaving EDS because "the company that I enjoyed and loved working for had taken a different course.  That's why I was available to new opportunities."  Capuano Dep. at 117. Capuano's resume listed his current position at EDS as "Strategic Sales, Northeast," and described his responsibilities as "identify[ing], qualify[ing] and facilitat[ing] the pursuit effort in closing EDS's largest Mega Deal transactions.  These are transactions that are greater than 250 Million and usually approach several billion dollars in TCV (Total Contract Value)." Resume [Doc. # 62, Ex. 3].  The resume further described his responsibilities in his final position at EDS as follows:

- Qualify opportunity and establish pursuit strategy
- Define Value Proposition and communicate C level agenda
- Estimate pursuit budget and appropriate resource staffing
- Coordinate multiple lines of business within EDS to deliver client requirements
- Establish relationships with third party intermediaries that are typical facilitators of Mega Deal RFP's

- Coordinate Alliance Partner relationships and deliverables
- Manage and oversee pursuit team to close business and exceed client expectations

His prior position at EDS, according to Capuano's resume, was "VP of Sales and Business Development, Esolutions, NE," which he held from 1999-2002.  In the VP position, Capuano stated that he designed and "implemented all policies and processes to initiate and support sales, business development in assisting companies launch strategic Internet businesses," and "directly manage[d] vertical industry practices, sales business development and dotted line responsibility for delivery comprised of 45 professionals," achieving "an outstanding record of revenue growth $34.0M/FY99, $56M/FY00 and $72M/FY01."  Id.

Based on his resume, Capuano was selected for interviews with Esposito; Paul Fabozzi, founder of ICP; Cliff Heinz, who served in a business development position; and Russell Pinto, an ICP in-house recruiter.  Esposito recalls that during the interview, Capuano told him that "he was elevated above VP, that he was now in charge of mega deals, in charge of national deals," and that Capuano gave him the impression that while he was no longer a VP, his current position at EDS was "higher" than VP. Esposito Dep. at 127-28.  Capuano denies "us[ing] the word 'elevated' or characteriz[ing] the position as better or worse," Affidavit of Raymond Capuano [Doc. # 61] at ¶ 3, but recalls that he told his interviewers that his EDS position at the time "was a

4

strategic sales position of significant responsibility, because I was asked to take on opportunities that were greater than $250 million in size when my responsibility . . . as VP of sales, was for revenue of 34, 56 — 34 million in '99, 56 in 2000 and 72 million in 2001, and so when a company then asks you to lead engagements that are $250 million in size up to $1 billion in size, I think one would say that that's a substantial responsibility."  Capuano Dep. at 108.

Capuano testified in his deposition that at the time he was moved from Vice President to the strategic sales position at EDS, he did not evaluate whether the move was a "promotion, demotion, or lateral move," because he "was interested and happy to take the position."  Id. at 39.  At his deposition, Capuano characterized the 2002 EDS position as one that "could certainly be a promotion based upon my reputation in the company and that they only put the best people on those types of opportunities," and because it presented the opportunity to "earn three times the amount of potential income that I did as a manager."  Id. at 48.  His base salary remained the same, however, and as an account executive he "had client-facing responsibilities and quota-generating responsibilities," while as a VP he "managed salespeople who had those same responsibilities."  Id. at 41; see also Deposition of Raymond Capuano in Tebbenhoff v. EDS, August 8, 2003 (attached to Defs.' Reply Mem. [Doc. # 79] at 63

(testifying that his sales executive position at EDS was not a managerial position).  Capuano acknowledged that in his final position at EDS, no employees reported directly to him, id. at 104-05; that he had no authority to discipline employees working with him on deals or affect their compensation, id. at 106; and that he had no authority to hire or fire people, id. at 106-07; while as a Vice President, on average 45 professionals reported to him, id. at 105; and he had authority to hire and fire employees, appraise their performance, provide raises, and discipline and demote those working for him.  Id. at 107. Further, Capuano acknowledged that in his final account executive position at EDS, he reported to Bob Koffler, who had taken over Capuano's position as Vice President and sat in Capuano's former office, while Capuano took a smaller office.  Id. at 140-41.

Despite the lack of typical managerial responsibilities in his final position at EDS, and the fact that no employees officially reported to him on the organizational chart, Capuano testified that he did not believe his resume — which stated that he "manage[d] and overs[aw]" the pursuit team engaging in "mega deals" --- was misleading, because he had "up to 150 people looking to my direction and leadership . . . As pursuit leader, they took my direction and were responsible for performing tasks that I had the authority to ask them to perform."  Id. at 105-06. Further, Capuano disputes ICP's contention the job title he

6

listed in his resume — "Strategic Sales Northeast Region" — did not adequately convey that his position was an account executive position, which under the standards of the industry, would necessarily be viewed as lower than a Vice President position, and notes that ICP did not "engage in a discussion" with him "as to whether [he] was an account executive or strategic sales" during his interview.  Id. at 103.

Capuano was offered a position with ICP in July 2002, with a $225,000 base salary plus incentives for revenue generated.  An addendum to the offer letter, to which Capuano agreed, provided that there would be "No Budget Quota requirements" and "1% of gross revenue of IT services brought in during 2002 by your team" in the year 2002, and a "$10 Million Sales Quota for yourself and your team" in the year 2003.  Letter from Michelle Fabozzi to Raymond Capuano, July 2, 2002 [Doc. # 53, Ex. 4].  While the offer letter stated that "employment is contingent upon the results of your background investigation," id., ICP verified only the dates of Capuano's employment at EDS and otherwise acquiesced to Capuano's request not to contact EDS as a reference.  Esposito Dep. at 23.

Capuano sought legal advice prior to signing an employment agreement with ICP, and his attorney exchanged several drafts of the contract with ICP before the parties reached mutually acceptable terms.  The employment agreement, signed on August 2,

7

2002, contained the following provisions related to termination:

7. <u>Termination</u>

(a) Notwithstanding anything in this Agreement to the contrary, this Agreement and Executive's employment hereunder may be terminated at any time by the Company for "Cause" (as such term is hereinafter defined) or, subject to the terms hereof, without "Cause", and shall also terminate upon Executive's death or Contract Disability (as such term is hereinafter defined).

(b) This Agreement and Executive's employment hereunder may be voluntarily terminated by Executive for no reason at any time upon at least thirty (3) days' prior written notice to the Company, or for "Good Reason" (as such term is hereinafter defined) at any time, subject to the notice and cure provisions set forth in Section 7(d) below.

(c) This Agreement and Executive's employment hereunder may be terminated by the Company without Cause at any time upon at least thirty (30) days' prior written notice to Executive.  In the event that Executive's employment is terminated by the Company without Cause (including, but not limited to, termination because of the Company's cessation of its professional services initiative), this Agreement and Executive's employment hereunder shall terminate immediately on the date fixed by the Company for the cessation of Executive's employment, and the Company shall be under no further obligation to Executive except that the Company shall thereafter be obligated to pay to Executive a sum equal to:

(i) (a) an amount equal to four (4) months' Base Salary, if Executive's termination shall occur prior to one year of continuous employment with the Company, or (b) an amount equal to three (3) months' Base Salary only if Executive's termination shall occur on or after one year of continuous employment with the Company; and

(ii) (a) an amount equal to accrued but unpaid Base Salary, if any, up to and including the last day of the Employment Period (such last date of employment being hereinafter referred to as the "Termination Date"), and sales commissions, if any, pursuant to Section 3(a)(ii) of this Agreement, and (b) expense reimbursement, if any, pursuant to Section 3(b) of this

Agreement, up to and including Termination Date.

. . .

Executive acknowledges and agrees that his rights to any payments under Section 7(c)(I) of this Agreement, if any, are in place of, and not in addition to, any payments or benefits which might otherwise be available under any current or future severance policy or similar policy or program followed by the Company or any of its affiliates, and, accordingly, Executive hereby waives any and all such rights to receive any payments or benefits under any such other policies and programs.  Notwithstanding anything herein to the contrary, Executive hereby further acknowledges that the Company's obligations to make any of the payments referred to in Section 7(c)(I) shall be subject to receipt by the Company from Executive of a general release in favor of the Company, as prepared by the Company and reasonably satisfactory to Executive.

. . .

(f) In the event that Executive's employment is terminated by the Company for cause, or if he voluntarily resigns from his employment with the Company, in either of which events, this Agreement and his employment hereunder shall terminate immediately upon the date fixed by the Company for the cessation of his employment, or upon his resignation, as the case may be, the Company shall have no further obligation to Executive except that the Company shall nonetheless be obligated to pay Executive expense reimbursement, if any, pursuant to Section 3(b) of this Agreement, up to and including Termination Date, and an amount equal to accrued but unpaid Base Salary, up to and including the Termination Date.  For the removal of doubt, in the event that the Company terminates this Agreement and Executive's employment hereunder for Cause, or if Executive voluntarily resigns from his employment with the Company, Executive shall not be entitled to receive payment of any sales commission after the Termination Date (regardless of whether such sales commissions are in respect of Sales that "took place" prior to the Termination Date and regardless of whether the Company has actually received payment from a customer in respect fo the Sale for which a sales commissions would otherwise have been payable).

(g) For purposes of the Agreement, termination for "Cause" shall mean termination due to any one or more of the

following:  (i) if Executive is indicted for committing a
felony or a decision or determination is rendered by any
court or governmental authority that Executive has committed
any act involving fraud, willful misconduct, dishonesty,
breach of trust, or moral turpitude; (ii) Executive's
material breach of his duty of loyalty to, or if Executive
commits an act of fraud or dishonesty upon, the Company;
(iii) if Executive demonstrates gross negligence or willful
misconduct in connection with his employment; (iv) if
Executive willfully fails or refuses to follow or adhere to
any of the Company's material policies or directives; (v) if
Executive engages in personal misconduct of such a material
nature so as to render his presence as a Senior Vice
President of the Company detrimental to the Company or its
reputation; as determined by the Company, and he fails to
cure the same, if capable of cure, within fifteen (15) days
after prior written notice thereof from the Company; or (vi)
if Executive commits a breach of or a default under any of
the terms or conditions of this Agreement, and he fails to
cure such breach or default, if capable of cure, within
fifteen (15) days after prior written notice thereof from
the Company.

Employment Agreement [Doc. # 53, Ex. 2].

Capuano served as Senior Vice President with ICP for less

than one year when, according to defendants, concerns arose about

his job performance,[2] which were compounded by rumors they began

---

[2]Among the job performance concerns defendants identified in
depositions were Capuano's inability to recruit members of his
sales team, requiring instead that ICP pay external recruiters to
hire sales executives; his failure to arrange any promising
sales; the difficulty they had in locating him; and his passivity
in marketing or bringing in leads.  See Esposito Dep at 11 ("I
had concerns with him not being . . . with his team enough.  I
had concerns with him not being out with the sales people enough
. . . .  We just talked about the fact that we were not getting
enough activity out of him and his sales people.  We were . . .
not getting qualified opportunities."); id. at 24-25 (Business
plan "never really was written.  Never really existed.  It only
was power point presentations which were really copies of IBM
presentations.  Cliff Heitz gave me a lot of feedback.  He had
concerns.  Some of out technical people had concerns about his

hearing that Capuano "was not a real VP.  He was just a
salesman."  Esposito Dep. at 124.  According to Michelle Fabozzi,
while in ICP's employ Capuano "didn't represent himself as a VP,
he didn't act as a VP, and he definitely didn't have a client
base that he said he had prior to coming on; so we decided to
look a little deeper." M. Fabozzi Dep. at 15.  As part of this
investigation, Linda Paulino, ICP's Vice President of Human
Resources, contacted EDS in May 2003, and, in a conversation with

---

knowledge.  Our other sales people had concerns about his
contacts and even presentations means in front of the group.");
id. at 70 ("We found out there was nothing behind the curtains
[in Capuano's pipeline of sales leads]. . . [W]e looked deeper at
them.  I went out on sales calls, Cliff Heitz went out on sales
calls.  There was nothing there."); Deposition of Michelle
Fabozzi, CEO of ICP [Doc. # 53, Part 4] at 37-42 ("He couldn't do
a forecast.  He couldn't do a commission plan.  He never visited
a client.  He was never in the 55 Broad location, very few times,
so he was home. . . He actually hired some people from agencies
which cost me a fee, which is not a company policy . . . He kept
going directly to agencies where he cost me at times thirty to
forty thousand dollars to hire an individual . . . [H]is [sales]
numbers were always zero."); Deposition of Paul Fabozzi [Doc. #
53, Part 4] at 60 (stating failure to perform included Capuano's
generation of "zero revenue, no prospects.  He was hired to
create sales.  Sales are zero.").

    Capuano acknowledges that ICP paid a recruiter to hire his
sales staff, and that he did not generate any sales revenue while
he was employed at ICP. Capuano Dep. at 193, 219.  According to
Capuano, however, he "was contractually prohibited from
recruiting any employees of EDS," Capuano Aff. at ¶ 40, and
during his time at ICP, he "was not provided with an adequate
sales staff, [his] personnel were not provided with adequate
training, and the company did not have sufficient money to
support his efforts."  Capuano Aff. at ¶ 20.  He states that he
was not given sufficient time to generate the $10 million in
sales targeted, as he was terminated only nine months into his
employment.  Capuano disputes, moreover, that he was difficult to
locate, stating that he "had a cell phone and two office numbers
and was on email regularly."  Capuano Aff. at ¶ 40.

a member of EDS' 'employment verification unit,' she was told
that Capuano's last title was "Client Sales Executive III."
Affidavit of Linda Paulino [Doc. # 53, Ex. 8] at ¶ 7; see also
EDS Business Records [Doc. # 53, Exs. 9-10].   Capuano
acknowledges his position as a Client Sales Executive III, but
states that "[i]t was not necessarily a formal title that someone
had on their business card.  It was a classification for
commission purposes."  Capuano Dep. at 293.  He also
acknowledges, however, that he did not have typical management
responsibility as a Client Sales Executive, as he had when he was
a Vice President at EDS.  Id. at 297.

After receiving information about Capuano's position at EDS,
defendants state that they concluded that Capuano had
misrepresented his job title and qualifications during the
interview process, which, along with his poor performance while
in their employ, formed the basis their decision to terminate
him.  See Esposito Dep. at 81 (stating that "misrepresentations"
referred to in termination letter included result of "background
checks that were done by HR and communications that he was not a
VP when we got him.  He wasn't who he said he was."); M. Fabozzi
Dep. at 16-17 (basis for termination included nonperformance and
perception that Capuano "misrepresented himself" by
"misrepresenting his title at his former employer.").

On May 20, 2003, ICP terminated Capuano.  The letter of

12

termination, signed by Louis Esposito, states as follows:

> I write respecting your continued failure to perform your duties as Senior Vice President, Professional Service Sales, and related misconduct, amounting to a material breach of your August 2, 2002 employment agreement . . .

> We have previously informed you of our complete dissatisfaction with your performance.  At the time we negotiated your Agreement, you represented to us that you would generate substantial sales in an amount approaching $10,000,000.  In reliance upon your representations, and at your urging, the Company incurred substantial expense to help you meet your purported needs.  Amount other things, we agreed to hire employees at a cost of more than $575,000.  Moreover, based upon your representations regarding your alleged ability to further our business, we entered into a generous employment arrangement with you.

> We are deeply troubled by your misrepresentations and your woeful job performance.  Although we communicated to you on numerous occasions our dissatisfaction with you in this regard (particularly your total failure to perform to a level commensurate with your previous representations) you have failed and/or refused to make any serious effort to address, let alone correct these issues.

> Accordingly, you are hereby notified that the Company is terminating your employment pursuant to Section 7(f) of the Agreement.  This termination shall be effective at the close of business on May 20, 2003. . . .

Letter from Louis Esposito to Raymond Capuano, May 20, 2003 [Doc. # 53, Ex. 11].

Capuano disputes the implication of the termination letter that he guaranteed to ICP that he would generate $10 million in sales, but acknowledges that he agreed with ICP during his interview that $10 million was a "reasonable goal," "based upon the assumption that the existing sales team would generate opportunity, based upon hiring four people and maintaining them during a reasonable period of time, at four, [and] based on the

13

fact that I had an 18-month agreement."[3]  Capuano Dep. at 232-33.

He disputes, moreover, that ICP communicated its dissatisfaction

to him on numerous occasions, as stated in the termination

letter, and contends that his performance was satisfactory given

the constraints within which he was working.  According to

Capuano, he was terminated not because of poor performance and

misrepresentations, but because "the company could not afford to

keep the sales staff due to 'revenue restraints' and reduced

sales in their core business."  Capuano Aff. at ¶ 44.  He

contends that he was "prematurely terminated and not given a

reasonable opportunity to achieve the sales goal we had

discussed."  Id. at ¶ 53.

Subsequent to Capuano's commencement of this suit, ICP

learned that Capuano had been placed on a "Performance

Improvement Plan" at EDS on June 17, 2002 for not having

generated any sales in 2002, and that, on August 1, 2002, his

employment with EDS was terminated for failure to perform.  See

Letter from Stephen Horner, attorney for Raymond Capuano, to Dick

Brown, Chairman of the Board and CEO of EDS, June 23, 2002 [Doc.

# 53, Ex. 5]; Memorandum from Ray Kalustyan to Ray Capuano re:

---

[3]In his deposition, Esposito identified the $10 million
sales quota as a key factor ICP considered when hiring for
Capuano's position, and stated that he discussed the $10 million
goal with all potential candidates.  Esposito Dep. at 37 ("If
they did not think they could bring in $10 million in their first
year, they were disqualified.").

Termination of Employment, August 1, 2002 [Doc. # 53, Ex. 6] (" .
. . [Y]our employment with EDS is being terminated effective
August 1, 2002, for failure to perform.").  While Capuano denies
that he was terminated from EDS for failure to bring in any
sales, see Capuano Aff. at ¶ 60(b), he does not dispute that EDS
stated that its decision to terminate him was based on such
performance-based reasons.

Count One of Capuano's complaint alleges that ICP breached
its employment contract with him by terminating his employment
without cause, and without notice and payment of four months
wages, as required by the contract.  Further, Capuano alleges
that he was not given an opportunity to cure any alleged failure
to perform his duties prior to termination, as required by the
contract.  He also alleges that he is owed approximately $4,000
in reimbursement for his business expenses.

Count Two of Capuano's complaint alleges breach of the
covenant of good faith and fair dealing.  Count Three, for
defamation, alleges that defendant Esposito falsely stated in his
May 20, 2003 letter to Capuano that Capuano had engaged in
misconduct and misrepresented his abilities and performance at
ICP, and that Esposito published this false statement to third
parties, harming Capuano's reputation.  Count Four, which sounds
in negligence, alleges that ICP breached its duty of care arising
out of the employment contract by negligently firing him.

15

Plaintiff has consented to the dismissal of this negligence claim.

Counts Five and Six allege negligent misrepresentation and fraudulent inducement.  According to Capuano, ICP misrepresented at the time it was recruiting him that it had secured $5,000,000 in funding from Brown Brothers for the Professional Services Division, and that it had sufficient cash reserves to support the Professional Services Division for 18 months, in order to assure him of ICP's financial stability and induce him to accept the position.  Capuano also claims that ICP misrepresented to him when he was being recruited that it would support the hiring and training of at least four full time sales executive employees to assist him, but that once hired, he was allowed four sales representatives for only three months, after which the sales force was reduced.

Finally, Count Seven alleges a violation of Conn. Gen. Stat. § 31-72 for failure to pay wages due under his contract.

## II.  Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In moving for summary judgment against a party who will bear the burden of

16

proof at trial, the movant's burden of establishing that there is
no genuine issue of material fact in dispute will be satisfied if
he or she can point to an absence of evidence to support an
essential element of the non-moving party's claim.  See Celotex
Corp. v. Catrett, 477 U.S. 317, 322-23 (1986) ("The moving party
is 'entitled to a judgment as a matter of law' because the
nonmoving party has failed to make a sufficient showing on an
essential element of her case with respect to which she has the
burden of proof.").  In order to defeat summary judgment, the
non-moving party must come forward with evidence that would be
sufficient to support a jury verdict in his or her favor.
Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986) ("There
is no issue for trial unless there is sufficient evidence
favoring the nonmoving party for a jury to return a verdict for
that party.").

     When deciding a motion for summary judgment, "'the
inferences to be drawn from the underlying facts . . . must be
viewed in the light most favorable to the party opposing the
motion.'"  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475
U.S. 574, 587-588 (1986) (quoting United States v. Diebold, Inc.,
369 U.S. 654, 655 (1962)).  However, "[w]hen a motion for summary
judgment is made and supported as provided in [the Federal
Rules], an adverse party may not rest upon the mere allegations
or denials of the adverse party's pleading." Fed. R. Civ. P.

56(e).  Instead, the party opposing summary judgment must set forth the specific facts in affidavit or other permissible evidentiary form that demonstrate a genuine issue for trial.  See id.

## III.  Discussion

### A.  Choice of Law

As an initial matter, the parties dispute whether the Connecticut or New York law applies to the contract and tort claims.  Magistrate Judge Joan Glazer Margolis has issued a thorough, well-reasoned analysis of the choice of law issue in her decision on plaintiff's application for a pre-judgment remedy, which this Court adopts and incorporates in full.  See Ruling on Plaintiff's Application for Prejudgment Remedy and Motion for Disclosure of Assets [Doc. # 88] at 21-25.  As to plaintiff's principal argument at this stage — that the choice of law provision in the Employment Agreement does not apply because the contract was not performed entirely in New York, as Capuano worked "frequently" from his home in Connecticut — it is evident that plaintiff has misconstrued the contract's terms.  Section 10(g) of the Employment Agreement provides:

> This Agreement shall be governed by, and construed and enforced in accordance with, the law of the State of New York applicable to contracts made and to be performed entirely therein (without giving effect to the conflict of law rules thereof.)

Employment Agreement [Doc. # 53, Ex. 2] at ¶ 10(g).

18

The choice of law provision thus states not that New York law applies only where the contract is performed in New York, but rather, that New York law is to be applied in the same manner as it would apply to "contracts made and to be performed entirely" in New York.  New York law thus applies to the contract claims, and, for the reasons discussed in Magistrate Judge Margolis' PJR decision, New York law applies as well to the tort claims in this case.

**B.  Breach of Contract**

Under New York law, "[a]n employer has the right to terminate employment at will at any time and for any reason or for no reason, except as that right may have been limited by express agreement with the employee or in a collective bargaining agreement of which the employee is a beneficiary." O'Connor v. Eastman Kodak Co., 65 N.Y.2d 724, 725 (N.Y. 1985).  Here, the Employment Agreement between Capuano and ICP provides that employment may be terminated with or without cause, but delineates specific bases for finding "cause" for termination and provides certain protections, including notice and severance pay, when termination is "without cause."  Capuano argues that ICP breached his Employment Agreement by terminating his employment without cause, because his contract does not include "poor performance" in the "Cause" category of termination and the "misrepresentation" identified in the termination letter was not

"dishonesty or fraud" within the meaning of the contract. According to Capuano, because he was therefore terminated without cause, he was entitled under the contract to 30 days advance notice and payment of four months wages.  See Employment Agreement [Doc. # 53, Ex. 2] at 7(g) (identifying six bases for termination for "cause"); 7(c) (providing for 30 days prior written notice of termination without cause and payment of "an amount equal to four (4) months' Base Salary, in Executive's termination shall occur prior to one year of continuous employment with the Company.").  He also argues that he is owed approximately $4,000 in reimbursement for his business expenses.

Section 7(g)(ii) of Capuano's Employment Agreement with ICP permits termination for "cause" if "Executive commits an act of fraud or dishonesty upon, the Company," and Section 7(g)(vi) permits termination for cause "if Executive commits a breach of or a default under any of the terms or conditions of this Agreement, and he fails to cure such breach or default, if capable of cure, within fifteen (15) days after prior written notice thereof from the Company."  At this summary judgment stage, defendants rely primarily on subsection (g)(ii), arguing that the undisputed evidence demonstrates that Capuano was dishonest in the interview process, and also argue, in the alternative, that the undisputed evidence that Capuano failed to set up a single promising sale during his employment supports his

20

termination under subsection (g)(vi).  Termination for either cause would make Capuano's breach of contract claim untenable, because by the contract's express terms, notice and severance pay is required only where the termination is without cause.

    1.  <u>Dishonesty</u>

Capuano disputes that defendants in fact relied on his alleged "dishonesty" in representing the nature of his final position at EDS as a basis for their decision to terminate his employment, because the termination letter identifies only Capuano's representation that he "would generate substantial sales in an amount approaching $10,000,000" as a basis for termination.  While the termination letter does not expressly refer to Capuano's description of his EDS position during the interview process, it clearly identifies both a "failure to perform" and "related misconduct," as the basis for the termination, and refers to "misrepresentations" in the plural. <u>See</u> Termination Letter [Doc. # 53, Ex. 11] ("Moreover, based upon your representations regarding your alleged ability to further our business, we entered into a generous employment arrangement with you.").  Both Esposito and Michelle Fabozzi, moreover, testified that they were looking for a candidate at a Vice President level or higher to be able to lead ICP's professional services initiative, that they investigated Capuano's background further after determining that he was not performing at the

expected level of a Vice President, and that the decision to
terminate Capuano was based in part on his misrepresentation of
his job title and the nature of his position at EDS.  Thus, the
undisputed evidence indicates that ICP viewed Capuano's prior
experience and responsibility at EDS as material to his ability
to perform in the ICP position, and it is this view that is
reflected in the termination letter.  Because the termination
letter, therefore, is not inconsistent with defendants'
deposition testimony, the plaintiff has demonstrated no genuine
dispute of material fact about whether ICP's stated reason for
termination included Capuano's alleged misrepresentation as to
the nature of his prior employment.

The more difficult question is whether, on the basis of the
undisputed facts in the record, it is proper to conclude as a
matter of law that ICP reasonably based its decision to terminate
Capuano on the "dishonesty" ground set forth in subsection
7(g)(ii).  While ICP had the discretion under the Employment
Agreement to decide whether to terminate for cause, much here is
disputed about whether Capuano was in fact "dishonest" in his
representations during the interview process.  Most notably,
while defendants state that in interviews Capuano described his
position at EDS as "higher than" or "elevated above" VP, or as a
"natural next step," Capuano maintains that he never
characterized his final position at EDS as better or worse than

22

his prior position as Vice President.  If Capuano did characterize his EDS position in the manner defendants describe, defendants' discovery that Capuano's EDS position was not higher than Vice President but rather "Client Sales Executive III," would provide sufficient grounds termination under Section 7(g)(ii).  It remains undisputed that in his position as "Client Sales Executive," Capuano had no management responsibility, as he had as a Vice President, and that he reported to someone who had taken over his former VP position and sat in his former office. It is similarly undisputed that EDS was not satisfied with Capuano's performance in his final year there, and had placed him on a Performance Improvement Plan.  By any objective standard, therefore, Capuano's position at EDS at the time of his interview with ICP cannot be viewed as a promotion or elevation above Vice President, even if the sales he was pursuing were so-called "mega deals" with the potential of generating hundreds of millions of dollars in revenue.

As Capuano's representations during his ICP interview about the nature of his EDS position remain in dispute, however, summary judgment based on the interview representations is inappropriate.  What then remain for consideration at this stage are the affirmative statements in Capuano's resume, and his failure to fully disclose the circumstances of his employment at EDS.  While undisputed, it is less clear that these statements or

omissions evince "dishonesty."  For example, while Capuano listed
his final position at EDS as "Strategic Sales, NE," not "Client
Sales Executive III," he explains that the former was merely a
functional description, and that ICP did not ask him about his
specific job title.  Similarly, while he listed as among his job
responsibilities that he "manage[d] and overs[aw]" the pursuit
team engaged in "mega deals," he insists that such description
was accurate because he had over 100 people who looked to his
direction and leadership, and who "perform[ed] tasks that [he]
had the authority to ask them to perform."  Capuano Dep. at 105-
06.  Finally, although it is undisputed that ICP expressed its
preference for candidates with significant management experience,
Capuano explains his failure to disclose the fact that he no
longer served in a management position as immaterial as ICP never
expressly asked him about whether his current EDS position was at
a Vice President level or higher, and that he in fact did have
significant management experience at EDS prior to his transition
to work on "mega deals" in 2002.

     There is little New York authority addressing what
constitutes dishonesty in the employment context.  In general,
"the measure of [the] meaning [of dishonesty] is not a standard
of perfection, but an infirmity of purpose so opprobrious or
furtive as to be fairly characterized as dishonest in the common
speech of men.  Our guide is the reasonable expectation and

24

purpose of the ordinary business man when making an ordinary business contract." <u>World Exchange Bank v. Commercial Casualty Ins. Co.</u>, 255 N.Y. 1, 5 (N.Y. 1930) (Cardozo, Ch. J.) (citation and internal quotation marks omitted).  "Dishonesty" is thus both broader and more amorphous than "fraud" (which also falls under Section 7(g)(ii)), and as it ultimately requires a determination not merely of whether a statement is false but also of whether it interfered with reasonable business expectations (even if not false), it is a question better left to a jury.

Capuano's resume statements here cannot be deemed false or fraudulent as a matter of law.  For example, a rational factfinder considering plaintiff's description of his EDS circumstances could view the term "Strategic Sales, NE" position listed in bold on his resume as a functional description of what Capuano did, rather than a description of who he was and what place he had within the corporate hierarchy.  Indeed, the title is striking because it cannot be used as a grammatical predicate nominative, as is typical when describing one's occupation, and differs from Capuano's descriptions of his prior positions (e.g., "VP of Sales and Business Development," "Business Development Manager," "Director of Alternate Channels").  While the title may be highly misleading, it need not be viewed as necessarily inconsistent with his official job classification as a "Client Sales Executive III."  Compare <u>Robitzek v. Reliance</u>

Intercontinental Corp., 183 N.Y.S.2d 870, 872 (N.Y. App. Div. 1959) (concluding that plaintiff made representations that were false, and that employer relied on them in hiring him, where plaintiff did not in fact have a Bachelor of Science degree in Business Administration and a Master's Degree in Retailing, as stated on his resume).  Similarly, Capuano's description of his role in managing and overseeing the pursuit team cannot be deemed to be false as a matter of law, absent evidence that the terms "manage" and "oversee" used in Capuano's field can only mean "dotted line" responsibility for the employees and not generic supervision of the work of these employees.

As "[s]ecrecy and concealment are the hallmarks of dishonesty," Boyle v. Petrie Soties Corp., 518 N.Y.S.2d 854, 859 (Sup. Ct. NY 1985), it is also necessary to consider whether Capuano's failure to disclose to ICP significant details about his employment at EDS was "dishonest" within the meaning of the employment contract.  While it is undisputed that defendants would not have hired Capuano had they known the circumstances of his employment at EDS, the evidence in the record does not establish that they asked Capuano directly whether he served at a Vice President level or otherwise served in a management capacity at the time of his interview.  Capuano's dissembling in the face of such direct questions would support a finding that he misrepresented his prior employment.  See, e.g., Ansley v.

<u>Varsity Transit, Inc.</u>, No. 98cv1916DABJCF, 1999 WL 672526, at * 7
(S.D.N.Y. August 26, 1999) (finding legitimate basis for
discharge for cause where, <u>inter alia</u>, employee stated on
application that he left previous job because of "conflicting
hours" when he had in fact been fired "for going to the home of a
supervisor and engaging him in a heated discussion.").  In the
absence of such directed questions, however, Capuano's duty to
fully disclose the circumstances of his EDS employment is less
apparent.  ICP's job notice does not itself require that the
candidate currently serve at the level of Vice President, <u>see</u>
Position Description [Doc. # 53, Ex. 1] (among job qualifications
required were "10-15 years successful experience in managing a
team of sales professionals focusing on professional services . .
. " and "management and development of staff, account management,
direct sales, and monitoring of budgets and goal attainment."),
and defendants have not identified any other provision in the
application or Employment Agreement that would require Capuano to
disclose information of the sort that he failed to reveal here.

    Capuano's undisputed statements and omissions were not
falsehoods per se, but a determination of whether they were
contextually dishonest requires evaluation of "the reasonable
expectation and purpose of the ordinary business man." <u>World
Exchange Bank</u>, 255 N.Y. at 5. Such determination must be left to

27

the jury.[4]

    2. <u>Failure to Perform</u>

    Defendants also argue that Capuano's poor performance at ICP constituted a breach of the terms or conditions of his Employment Agreement and therefore justified his termination for cause under Section 7(g)(vi) of the Employment Agreement.  It is undisputed that Capuano agreed to a $10 million sales quota in the year 2003 in accepting the offer from ICP, <u>see</u> Offer Letter Addendum [Doc. # 53, Ex. 4] at 2 (reflecting Capuano's acceptance of terms), yet he failed to generate any sales revenue during his nine months at ICP up to his termination in May 2003, and ICP did not find any

_____

    [4]Defendants also argue that Capuano's termination should be deemed for "cause" under the after-acquired evidence rule.  Under New York law, evidence uncovered subsequent to the termination may be used to support the contractual right to terminate, notwithstanding the employer's actual motive at the time of the decision.  <u>See</u>, <u>e.g.</u>, <u>Robitzek v. Reliance Intercontinental Corp</u>., 183 N.Y.S.2d 870, 871-72 (N.Y. App. Div. 1959).  While the Supreme Court in <u>McKennon v. Nashville Banner Pub. Co.</u>, 513 U.S. 352 (1995) prohibited the use of after-acquired evidence to defeat an ADEA claim, courts applying New York law have limited <u>McKennon</u> to its context, noting that an employer's motive is central to statutory discrimination claims but immaterial to contract claims under New York law.  <u>See</u> <u>Kerns, Inc. v. Wella Corp</u>., 114 F.3d 566 (6th Cir. 1997) (applying New York law). Regardless of the continued validity of the after-acquired evidence rule, however, consideration of the after-acquired evidence in this case would not provide a basis for termination under the contract.  Defendants learned in discovery of Capuano's placement on a Performance Improvement Plan and his ultimate termination from EDS.  While Capuano did not disclose this information during his interview, his description of his reasons for leaving EDS — that "the company that I enjoyed and loved working for had taken a different course," Capuano Dep. at 117 — is sufficiently vague and not necessarily inconsistent with the reality of his precarious employment situation.

of the leads in Capuano's pipeline to be useful.  Defendants have
not identified other contract terms that were breached by
Capuano's failure to bring in sales, and poor performance itself
is not included as a basis for "for cause" termination.[5]  Absent
evidence that it would be impossible to meet the sales quota in
the remaining nine months of plaintiff's contract, or that there
were other terms of employment that were breached, defendants
have not satisfied their burden at this stage.

    3.  <u>Reimbursement for Business Expenses</u>

Capuano also claims that he is owed $4000 in reimbursement
for his business expenses under Section 3(b) of the Employment
Agreement, which provides that "[t]he Company shall reimburse
Executive for his reasonable documented and receipted business
travel and entertainment expenses incurred by him on or after the
Commencement Date for or on behalf of the Company in furtherance
of the performance of his duties hereunder . . . , subject to the
expense reimbursement policies of the Company from time to time
in effect."  An ICP policy in effect required such business
expenses to be submitted within 21 days, and Capuano submitted
his expenses late.  <u>See</u> ICP Financial Department Procedure [Doc.

---

[5]Section 7(g)(iii) of the Employment Agreement permits
termination for cause "If Executive demonstrates gross negligence
or willful misconduct in connection with his employment."  As
defendants do not rely on this provision, and there are aspects
of Capuano's performance that are strongly disputed, the Court
does not reach whether the performance that defendants attribute
to Capuano, if credited, would satisfy Section 7(g)(iii).

# 53, Ex. 13] at 9; Capuano Dep. at 372-75; Esposito Dep. at 54-56.  Capuano testified, however, that the policy was not always enforced, and that Esposito "had a specific discussion on the day that he called me to separate me from the firm," "[s]aying that he had authorized in paying the full expenses would be no problem and that I would get reimbursed."  Capuano Dep. at 374; see also Esposito Dep. at 56 (stating that employees "usually weren't" reimbursed for expenses submitted after deadline).  Because the policy itself does not require that late expenses not be reimbursed, see Financial Department Procedure [Doc. # 53, Ex. 13] at 9 ("Failure to adhere to [deadline] may result in non-reimbursement to the associate")(emphasis added), and Capuano has testified to an oral agreement with Esposito that he would be reimbursed, defendants' motion is denied on this basis as well.

As genuine disputes of material fact remain on Capuano's breach of contract claim, defendants' motion is denied as to this count.

## C.  Breach of Implied Covenant of Good Faith and Fair Dealing

Plaintiff's claim for breach of the implied covenant of good faith and fair dealing, incorporates the allegations in his breach of contract claim and alleges that ICP terminated him for reasons that it knew or should have known were false.  As Magistrate Judge Margolis concluded in the PJR decision, [Doc. # 88] at 31, "[i]t is well-settled under New York law, . . . that

an implied covenant of good faith does not attach to employment contracts governed by New York law." Tischmann v. ITT/Sheraton Corp., 882 F.Supp. 1358, 1367 (S.D.N.Y. 1995) (citations omitted).  Because the employment agreement with ICP established an at-will employment relationship, only the express terms may be enforced, as "it would be incongruous to say that an inference may be drawn that the employer impliedly agreed to a provision which would be destructive of his right of termination . . . to imply such a limitation from the existence of an unrestricted right would be internally inconsistent." Sabetay v. Sterling Drug, Inc., 514 N.Y.S.2d 209, 212 (N.Y. 1987)(internal quotation omitted).  Defendants are accordingly entitled to summary judgment on this count.

### D.  Defamation

"Defamation, consisting of the twin torts of libel and slander, is the invasion of the interest in a reputation and good name." Hogan v. Herald Co., 446 N.Y.S.2d 836, 839 (N.Y. App. Div.), aff'd on op. below, 458 N.Y.S.2d 538 (N.Y. 1982). Generally, spoken defamatory words are slander; written defamatory words are libel.  Albert v. Loksen, 239 F.3d 256, 265 (2d Cir. 2001).  It is unclear whether plaintiff's defamation claim is based only on an alleged publication of the termination letter, or on other alleged spoken defamatory statements. Regardless, under New York law, the plaintiff must establish four

31

elements in order to prevail: (1) a false and defamatory statement of fact; (2) regarding the plaintiff; (3) published to a third party by the defendant; and (4) resulting in injury to the plaintiff.  Weldy v. Piedmont Airlines, Inc., 985 F.2d 57, 61 (2d Cir. 1993); Celle v. Filipino Reporter Enterprises Inc., 209 F.3d 163, 176 (2d Cir. 2000) (citing cases).  The fourth element is presumed if the statement is deemed defamatory per se; otherwise the plaintiff must plead special damages. "[A] writing which tends to disparage a person in the way of his office, profession or trade" is defamatory per se and does not require proof of special damages. Davis v. Ross, 754 F.2d 80, 82 (2d Cir. 1985) (quoting Nichols v. Item Publishers, 309 N.Y. 596, 602 (N.Y. 1956)).

Here, there is no evidence in the record that any defendant was responsible for publishing defamatory information to a third party.  In his deposition, Capuano testified that he did not know for certain whether any third party saw his termination letter, but that "I had conversations with other parties after the fact that referred to some of these items, which may imply that they read them or did not, so I don't know for certain who actually did." Capuano Dep. at 355-56.  He states that he recalled speaking to "parties at IBM," including John Nelson and David Goldstein," and that they "talked about the separation, not the content of the letter."  He states, however, that neither these

individuals nor anyone else told him that ICP was the source of their information about the nature of his termination.  See id. at 357 ("Q.  Did anybody tell you that the allegations of misconduct were repeated to them by anybody at ICP?  A.  No, I wouldn't say they did that."); see also id. at 359 ("Q.  Who did [defendants] make negative statements about you outside of ICP?  A.  I don't know the answer to that."); id. at 263 ("Q.  You have no evidence sitting here today that Lou [Esposito] ever broke that agreement [not to say negative things]?  A.  I don't have evidence today, that's correct.").  Capuano has identified no other evidence in the record that defendants published defamatory statements.  Given the absence of proof on this essential element, plaintiff's defamation claim cannot prevail.

### E.  Negligent Misrepresentation and Fraudulent Inducement

Plaintiff's negligent misrepresentation and fraudulent inducement claims are based on the same factual underpinnings, namely, that defendants represented to him that they had secured $5 million in venture capital from Brown Brothers Harriman in order to reassure him of the financial viability of the ICP Professional Services Initiative, which induced him to leave his employment at EDS, turn down an offer from another employer, Collaborative Consulting, and accept a position with ICP.  See Capuano Dep. at 183 ("I said he lied to me when he expressed his commitment to stay the course to make the investment, and he had

secured $5 million in funding and when I told him he would stay

the course, that later when that wasn't the case, he didn't tap

into the funding and didn't live up to his commitment, which are

the terms and conditions by which I left EDS and joined ICP.")[6];

Collaborative Consulting Offer [Doc. # 62, Ex. 5].  In addition,

Capuano alleges that in order to induce him to accept the

position, defendants misrepresented the level of the training and

experience of the technical support staff that would assist him.

See, e.g., Capuano Dep. at 220 ("Lou Esposito represented to me

that he had over a hundred certified SEs, that is, systems

engineers, who were trained in the tool set and certified during

the interview process of the foundation tools of which we were

going to sell.").[7]

---

[6]Esposito testified that Brown Brothers committed to
investing in ICP, but that ICP declined to take the funding,
because "we didn't like what they asked for in return, shares-
wise and point-wise and all that stuff."  Esposito Dep. at 95,
98.

[7]Capuano has also asserted that ICP failed to provide him
with the sales staff he had been promised before he was hired.
As Capuano has acknowledged that he hired and employed four
account executives in accordance with his Employment Agreement,
see Offer Letter Addendum [Doc. # 53, Ex. 4] (referring to "3-4
Client Executives plus 1 Business Development Associate" as part
of Capuano's team in the year 2003), the high level of turnover
on his team cannot establish that the representation was false at
the time it was made.  See Capuano Aff. at ¶ 43 ("One salesperson
was terminated for poor performance.  Two salespeople . . . quit
due to lack of support from ICP.").  Moreover, in order to state
a cause of action for negligent misrepresentation or fraudulent
inducement, "[t]he alleged misrepresentation must be factual in
nature and not promissory or relating to future events that might
never come to fruition." Hydro Investors, 227 F.3d at 20-21.

Under New York law, the elements for a negligent misrepresentation claim are that "(1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment." Hydro Investors, Inc. v. Trafalgar Power Inc., 227 F.3d 8, 20 (2d Cir. 2000) (citations omitted); see also Eiseman v. State, 518 N.Y.S.2d 608, 614 (N.Y. 1987).

Similarly, to prove a claim of fraudulent inducement under New York law, plaintiff must establish: "(1) a representation of material fact, (2) which was untrue, (3) which was known to be untrue or made with reckless disregard for the truth, (4) which was offered to deceive another or induce him to act, and (5) which that other party relied on to its injury." Aetna Cas. and Sur. Co. v. Aniero Concrete Co., Inc., 404 F.3d 566, 580 (2d Cir. 2005) (citing Helmsley-Spear v. Westdeutsche Landesbank, 692 F.Supp. 194, 203 (S.D.N.Y. 1988); Jo Ann Homes at Bellmore, Inc. v. Dworetz, 302 N.Y.S.2d 799, 803 (N.Y. 1969)).

Under both causes of action, therefore, plaintiff's reliance on the false statements is an essential element.  It is on this

35

essential element that plaintiff's evidence is lacking.  As

Magistrate Judge Margolis reasoned:

> [D]espite Capuano's alleged concerns over the funding,
> Capuano signed his employment contract, which explicitly
> provided in Section 7(c) that he may be terminated 'without
> Cause (<u>including, but not limited to, termination because of
> the Company's cessation of its professional services
> initiative</u>).' (Ex. 2) (emphasis added).  Plaintiff testified
> that he took account of this risk by including the four-
> month severance clause if such cessation were to occur.

PJR Ruling [Doc. # 88] at 34.

For example, Capuano's deposition states as follows:

> Q.   You knew the risk going in, if this line of business
>      didn't pan out, you could be let go and all the sales
>      force let go.
> A.   That's a possible permutation I considered.
>
>      . . .
>
> Q.   Then the complaint says you specifically addressed this
>      possible scenario [financial strain on ICP] during your
>      employment contract negotiations.  Is that true?  Did
>      you express a concern over what happens if the money is
>      not there?
> A.   Absolutely.
> Q.   What were you told?
> A.   I was told that we had an employee agreement.  That's
>      why Lou and I negotiated multiple times, that severance
>      section of the contract which you have all those
>      versions. . .

Capuano Dep. at 223, 324-35.

Because it remains undisputed that Capuano was aware that he

was being hired "to launch a focus on a new business," <u>id</u>. at

222, accounted for the risks that the venture would not succeed

by insisting on a severance arrangement, <u>see id</u>. at 226, and knew

that the initiative could be terminated at any time, Capuano

cannot sustain his burden of proving reliance.[8]

Further, Capuano's evidence regarding representations defendants made as to the training of ICP staff is insufficient to prove (1) that they were statements of a present fact rather than merely a promise to perform a future act, (2) that the statements were false at they time they were made, or (3) that the statements were made prior to his acceptance of employment at ICP.  An "alleged misrepresentation must be factual in nature and not promissory or relating to future events that might never come to fruition," Hydro Investors, 227 F.3d at 20-21, and absent "a preconceived and undisclosed intention of not performing," Sabo v. Delman, 164 N.Y.S.2d 714, 716 (N.Y. 1957), such a statement is insufficient to sustain a cause of action for fraud or negligent misrepresentation.  See McGovern v. Best Bldg. & Remodeling, 666 N.Y.S.2d 854, 856 (N.Y. App. Div. 1997).  Moreover, because Capuano claims that he relied on representations regarding

---

[8]Defendants also argue that the merger clause in Section 10(i) of the Employment Agreement, which provides that the contract "cancels and supersedes any and all prior understandings, agreements and representation, written or oral, expressed or implied," prevents Capuano from relying on ICP's oral representations.  The Court disagrees that such contractual language would dispose of Capuano's fraudulent inducement or negligent misrepresentation claims.  Under New York law, "parol evidence of . . . fraudulent oral misrepresentations may be introduced to avoid the agreement" despite the existence of a general merger clause as provided in Section 10(i) of the Employment Agreement.  See Sabo v. Delman, 164 N.Y.S.2d 714, 716 (N.Y. 1957); Danann Realty Corp v. Harris, 184 N.Y.S.2d 599 (N.Y. 1959).

training in accepting the position at ICP, he must demonstrate
that these statements were made during the hiring process and not
after he began his ICP position.  As much of Capuano's evidence
relates to promises of future training or to statements made
after he was hired, he cannot satisfy these requirements.  See
Capauno Dep. at 185-86 (testifying that Michelle Fabozzi told him
"a week or two after" he took the job that "she was committed to
give me the training and that . . . her and her father were going
to speak to Lou and get the people effectively trained and put
together a training plan and that training didn't start until the
month or two before . . . ICP decided to sever our
relationship."); id. at 189 (stating "later in the process, when
I was at the company . . . then there were issues about why we
were not training people, why we were not doing the things we
were committed to do before I took the job.").[9]

Capuano's testimony that Esposito told him that he had "over
a hundred" certified systems engineers trained in the tools ICP's

---

[9]Capuano's testimony as to the commitments made to him by
Paul Fabozi before he was hired at ICP is vague.  See Capuano
Dep. at 185-86.  It appears, however, that the "commitment" to
which Capuano refers was the $5 million dollars in funding. Id.
at 186. Capuano does not expressly identify Paul Fabozzi as the
source of a representation as to training.  To the extent,
however, that he attributes promises as to future training to
both Michelle and Paul Fabozzi, see id., they cannot form the
basis of his misrepresentation or fraudulent inducement claims
because there is no evidence that they relate to any then-
existing training or a preconceived intention of not providing
training.

professional services initiative would sell, and implication that

this statement was made sometime during the interview process,

see id. at 220, does not satisfy his burden of proving fraudulent

inducement or negligent misrepresentation, because there is no

evidence in the record that these systems engineers were not in

fact certified in the tools Esposito claimed.  Capuano did not so

testify, and there is no evidence explaining what particular

certifications were needed for the services Capuano was selling,

what certifications Esposito claimed ICP's employees had, or what

certifications the employees in fact possessed.  Capuano's

complaints about ICP's training commitments thus cannot be tied

to specific representations ICP made about its existing trained

and certified staff.[10]   As there is therefore an absence of

_____

[10]For example, Erik Liberman, Vice President of Sales of
ICP, e-mailed Cliff Heitz, ICP's director of professional
services business development, that "Up until recent, we were not
aware of, committed to nor had the understanding of the Websphere
tools and it's capabilities to assist."  E-mail from Erik
Lierbman  to Cliff Heitz, March 24, 2003 [Doc. # 62, Ex. 12].
Capuano has presented no evidence, however, that the "Websphere"
tools were among those in which Esposito represented ICP staff
was certified prior to Capuano's hiring.  Capuano also notes that
Esposito testified that Capuano "complained about not having
certifications all the time.  Whether it was IBM or somebody
else.  We felt that it had nothing to do with what he was doing .
. . [W]e eventually gave him some certified people that he wanted
to just quiet him."  Esposito Dep. at 16-17.  Because the
certifications Esposito testified to here are not specified or
linked to those that Esposito told Capuano were available, and
because Esposito states that ICP provided these certified staff
to Capuano, this testimony does not demonstrate the falsity of
prior representations.  Capuano also states that the certified
employees he was provided were committed to another ICP division
entitled "Strada."  See E-mail from Cliff Heitz, January 8, 2003

evidence on an essential element of Capuano's negligent misrepresentation and fraudulent inducement claims, these claims must be dismissed.

### F.  Wage Claim

Plaintiff also seeks double damages for unpaid wages under Conn. Gen. Stat. § 31-72, on grounds that the Employment Agreement characterized his termination payment as "wages," and not as severance.  Section 7(c) of the Employment Agreement provides that ICP is "obligated to pay to Executive a sum equal to (i)(a) an amount equal to four (4) months' Base Salary, if Executive's termination shall occur prior to one year of continuous employment with the Company . . . ."  It further provides:  "Executive acknowledges and agrees that his rights to any payments under Section 7(c)(i) of this Agreement, if any, are in place of, and not in addition to, any payments or benefits which might otherwise be available under any current or future severance policy or similar policy . . . and accordingly, Executive hereby waives any and all such rights to receive any payments or benefits under any such other policies and programs."  Magistrate Judge Margolis rejected plaintiff's wage claim under Conn. Gen. Stat. §31-72 after a careful and thorough analysis,

---

[Doc. # 62, Ex. 13].  This does not contradict any prior representations that appear on the record before the Court, because Capuano has not testified that ICP told him it would commit its existing certified staff to Capuano's division.

which this Court adopts and incorporates herein.  Plaintiff's
reliance on <u>Mytych v. May Dep't Stores Co.</u>, 260 Conn. 152 (2002),
is unavailing, as <u>Mytych</u>, in stating that "our wage payment
statutes expressly leave the timing of accrual to the
determination of the wage agreement between the employer and
employee," merely emphasized that the wage statutes were
remedial, not substantive, and that the terms of the employee
wage agreement should be honored.  Here, as Magistrate Judge
Margolis concluded, "the contract plainly reads '<u>an amount equal
to</u>' four months base salary.  The waiver of severance provision,
read in conjunction with this Section, limits plaintiff's
recovery of the severance in an 'amount equal to' four months
base salary.  The contract, which, as stated above, was
negotiated by plaintiff's counsel, does not provide for this
waiver in lieu of four months of wages."  PJR Ruling [Doc. # 88]
at 36.  Because "[s]everance pay is not . . . wages," as "it is
not compensation for services rendered," <u>id</u> (quoting <u>Drybrough
v. Acxiom Corp</u>., 172 F. Supp. 2d 366, 371 (D. Conn. 2001),
plaintiff cannot prevail under § 31-72, and Count Seven is
accordingly dismissed.

## IV.  Conclusion

For the foregoing reasons, defendants' motion for summary judgment [Doc. # 49] is GRANTED, as to the breach of the covenant of good faith, defamation, negligence, negligent misrepresentation, fraudulent inducement, and statutory wage claims in plaintiff's amended complaint, and DENIED, as to the breach of contract claim.

IT IS SO ORDERED.

/s/

_____

_____Janet Bond Arterton, U.S.D.J.

**Dated at New Haven, Connecticut, this 20th day of July, 2005.**