UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT
_____

**Raymond Capuano**              :
                                 :
**v.**                           :      3:03cv1572 (JBA)
                                 :
**Island Computer Products,**    :
**Inc. et al.**                  :
_____
_____

<u>Ruling on Defendants' Motion for Sanctions [Doc. # 67]</u>

Familiarity is presumed with the Ruling on Defendants' Motion for Summary Judgment, filed July 21, 2005 (Doc. #102)("Summary Judgment Ruling", 2005 WL 1719733 (D. Conn. 2005)).  This ruling denied defendants' motion with respect to Count One, for breach of employment contract, 2005 WL 1719733, at *8-12 & 17, but granted the motion with respect to plaintiff's remaining counts.  <u>Id.</u> at *12-17.

On February 11, 2005, defendants filed the pending Motion for Sanctions Pursuant to Fed. R. Civ. P. 37 and brief in support. (Docs. ##67-68).[1]  On March 4, 2005, plaintiff

---

[1] The following six exhibits were attached: copies of plaintiff's Responses to Defendants' First Set of Interrogatories, dated April 2, 2004 and of plaintiff's Responses to Defendants' First Set of Production Requests, also dated April 2, 2004 (Exh. A); excerpts from plaintiff's deposition transcript, taken on June 17, 2004 and September 1, 2004 (Exh. B); copy of letter, dated June 23, 2002, from plaintiff's counsel to Electronic Data Services ("EDS"), with copy of plaintiff's resume attached (Exh. C); copy of memorandum, dated August 1, 2002, from EDS to plaintiff, with Settlement Agreement and Release attached (Exh. D); copies of plaintiff's affidavit and plaintiff's Local Civil Rule

1

filed his brief in opposition (Doc. #76), as to which defendants filed a reply brief four days later. (Doc. #77).[2] For the reasons described below, defendants' Motion for Sanctions (Doc. #67) is <u>granted in part</u>.

**I.   Discussion**

As set forth in defendants' brief, defendants contend that plaintiff's employment was terminated for cause within the meaning of plaintiff's employment contract with defendant Island Computer Products, Inc. ("ICP"), in part due to defendant ICP's discovery that plaintiff had misrepresented the circumstances of his departure from his previous employer, Electronic Data Services, Inc. ("EDS"), and in particular, that plaintiff was in the process of being terminated from EDS while he was interviewing with defendant ICP. (Doc. #68, at 2).

Interrogatory No. 4 asked whether plaintiff had ever been terminated, asked to resign, suspended or otherwise disciplined at a previous job; plaintiff responded on April 2, 2004: "Suspended with pay from EDS during internal investigation surrounding one of my employees.  Cleared of

---

56(a)(2) Statement, both dated January 26, 2005 (Exh. E); and copy of memorandum, dated August 1, 2002, from EDS to plaintiff, with computer printout attached (Exh. F).

[2]Attached was a copy of a letter, dated June 24, 2002, from Collaborative Consulting, LLC to plaintiff.

all questions and reinstated with out discipline." (Doc. #68, Exh. A, Plaintiff's Responses to Defendants' First Set of Interrogatories, at 2).

During the first session of his deposition on June 17, 2004, plaintiff was asked why he left EDS, to which he answered: "ICP had contacted me for several months and recruited me to join them." (Doc. #68, Exh. B, at 50-51). Shortly thereafter, after acknowledging that the answers to interrogatories were made under oath and he had sworn to the accuracy of the answers, and after reviewing his answer to Interrogatory No. 4 (<u>id.</u> at 80-81), the following colloquy occurred:

> Q. Do you remember whether or not you have ever been fired before?
>
> A. . . . I don't recall being fired before.
>
> Q. So you could have been fired before?
>
> A. I don't recall.
>
> Q. Does that mean it's possible you were or does that mean no?
>
> A. From all of the positions that are listed here in the interrogatory, I don't believe I was fired at any of them.
>
> Q. Okay. Well, do you note that your responses [do] not say you don't recall? . . .
>
> . . .
>
> A. To the best of my memory, and as I sit here today, when I answered that question, and as I sit here today, I still believe it's the same

3

>answer: I have never been terminated [or] asked to resign. . . . I did put in my response I was suspended. To answer your specific question, as I am trying to remember, no, I have never been terminated or asked to resign, as best I recall.

(Id. at 81-82).

When plaintiff was asked if defendant ICP had inquired about plaintiff's reasons for wanting to leave EDS, he responded that he had told them that:

>[T]he overall corporate environment at EDS was getting tenuous at best. The senior executives, who I was one of, were getting unduly pressured and the corporate environment was not what it once was.
>
>   . . .
>
>   So a company that I enjoyed and loved working for had taken a different course. That's why I was available to new opportunities.
>
>   Q. But you were not actively seeking outside opportunities.
>
>   A. I was not actively, but I was willing to engage in discussion and talk if another opportunity presented itself.

(Id. at 117). Shortly thereafter, the following colloquy occurred:

>   Q. Did you resign from EDS?
>
>   A. . . . I don't recall.
>
>   Q. You don't remember if you resigned from EDS? . . . Did you resign from EDS?
>
>   A. I don't recall.
>
>   Q. You could have been fired?
>
>   A. I don't recall.

4

(Id. at 133).   After consulting briefly with his attorney, plaintiff indicated that he would give "a more definitive" answer, with the following colloquy:

>    Q.  Did you resign from EDS?
>
>    A.  I believe I did, yes, I did.
>
>    . . .
>
>    Q.  Why can't you answer that question "yes" or "no"?
>
>    A.  Because there was a document that I signed upon giving EDS notice that I was leaving, that I need to refresh my memory about what was included in that agreement as we agreed to separate ways, and I don't remember . . . what the exact language in that agreement was, but I and EDS both came to a mutual agreement as to when and how I would leave the company based upon a business discussion and set of issues.
>
>    So you are asking me to categorize it in one way or another.  It was not a firing.  You may want to say I resigned.  I went in and said I was leaving the company.  We both then had a discussion about the terms and conditions because there was an issue of what was due me, and as a result, we signed an agreement and I was paid the funds that [were] due me.

(Id. at 133-35).   He further acknowledged that in this document, he agreed not to sue EDS, for which he received money.  (Id. at 136).   The following colloquy then followed:

>    Q.  Did you resign in lieu of being fired?
>
>    A.  I don't recall.
>
>    Q.  You could have been?
>
>    A.  I don't recall.

5

> Q. Did you tell ICP that you were about to be fired and so you resigned as part of a settlement with [EDS]?
>
> A. I don't recall.

(Id. at 136-37). Mr. Capuano also testified that his attorney reviewed the agreement with EDS, and that he did not have "a strong recollection of all the details" of the document, including "how we categorized" the separation. (Id. at 137, 143). Toward the end of the first session, plaintiff was again asked why he left "a secure job at EDS to take a job [at ICP] with so much risk," to which he responded: "[T]he atmosphere at EDS was getting very tenuous. . . . That doesn't mean I was at risk of being fired or at risk of losing a job, but the environment was getting stressful." (Id. at 224).

After this first session, defendant issued a subpoena to EDS in Texas and plaintiff's counsel was deposed with respect to his communications with EDS. (Doc. #68, at 7). Defense counsel received a copy of a letter, dated June 23, 2002, from plaintiff's counsel to EDS, which protested the "extremely unfair action" EDS had taken against plaintiff, and acknowledged that "[u]nquestionably, [plaintiff] will be terminated shortly for 'poor performance' . . . ." (Doc. #68, Exh. C, at 1-2). The letter ended:

> My client knows that his days are numbered at EDS and that there is no turning back. He deeply

6

> regrets the way that he has been treated by the Company but now wants to focus on getting a fair severance package for himself and his family. . . . [A] far more generous severance package is the very least that the Company should do as it discards my client into the pile of former employees.

(<u>Id.</u> at 3). This letter was written during the time plaintiff was negotiating an employment contract with defendant ICP. Defense counsel also obtained two memoranda sent by EDS to plaintiff on August 1, 2002, the day before plaintiff signed his employment contract with defendant ICP. (Doc. #68, Exhs. D & F). One memorandum advises plaintiff:

> [B]ecause you are being terminated for performance-based reasons, you are not eligible for any type of separation pay under EDS' Severance Plan. However, separate and apart from the Severance Plan, EDS is willing to offer to provide you with four (4) weeks of your current base salary, contingent upon you signing the attached Agreement.

(Doc. #68, Exh. D). Attached was a Settlement Agreement and Release, which begins that plaintiff and EDS "wish to establish a final and binding settlement with regard to the termination of [plaintiff's] EDS employment." (<u>Id.</u>). On August 1, 2002, plaintiff received another memorandum from EDS, with the caption "Termination of Employment"; the memorandum informed plaintiff that "effective immediately, your employment with EDS is being terminated effective August 1, 2002, for failure to perform." (Doc. #68, Exh. F).

When his deposition was resumed on September 1, 2004, defense counsel asked plaintiff to confirm that he had been

7

fired from EDS, to which plaintiff responded:

> A. You continue to insinuate I was fired. I have read the documents. They are not what they appear to be, and further discussion would need to be had to explain them.
>
> Q. . . . So the documents are wrong, you were not fired?
>
> A. The documents are statements made by individuals, but that was not later what was the separation agreement by which I left EDS.
>
> Q. The separation agreement has a provision in it, doesn't it, that you will never come back to EDS and you will never apply there again, doesn't it?
>
> A. That's in the agreement. . . .

(Doc. #68, Exh. B, at 251-52). Plaintiff further acknowledged that he had read, and authorized, the June 23, 2002 letter that his attorney sent to EDS. (Id. at 267-72, 274-75). When asked whether he agreed with his attorney's belief on June 23, 2002 that plaintiff "[u]nquestionably . . . will be terminated shortly for poor performance," plaintiff responded that he believed that his termination "wasn't a foregone conclusion" but was only "a possible potential scenario." (Id. at 275-77). Defense counsel thereafter asked plaintiff if he informed anyone at defendant ICP, as he was signing his employment contract, that he had just been terminated from EDS; plaintiff responded that he had "never agreed that [he] was fired from EDS." (Id. at 289). When defense counsel inquired whether plaintiff told anyone from

8

defendant ICP that he "had just gotten a document which purports to fire [him]," plaintiff answered: "I don't recall."  (Id. at 290).

On January 26, 2005, plaintiff filed his affidavit and Local Civil Rule 56(a)(2) Statement, in which he averred: "I signed the ICP contract a month before EDS terminated my employment.  EDS only terminated my employment after receiving a letter from my counsel protesting my treatment at EDS."  (Doc. #86, Exh. E, Affidavit of Raymond A. Capuano at ¶ 90).[3]

In their brief, defendants describe plaintiff as a "'moving target,' prejudicing [d]efendants, who have been continually compelled to shift their discovery strategies to meet whatever 'theory du jour' that [plaintiff] elects to adopt."  (Doc. #68, at 18).  Defendants seek the following options: (1) dismissal of the action under Fed. R. Civ. P. 37(c)(1) and 37(b)(2)(c); (2) designation of facts deemed established against plaintiff for purposes of adjudication of the summary judgment motion and/or at trial, under Rules 37(c)(1) and 37(a)(2)(A)-(B); and/or (3) reasonable

---

[3]In this motion, defendants also argue that plaintiff was not truthful during discovery regarding his final position at EDS. (Doc. #68, at 11-14).  However, given that this is a disputed issue of fact, see Summary Judgment Ruling, 2005 WL 1719733, at *9-11, this issue will not be addressed.

9

attorney's fees for defendants' costs and expenses caused by plaintiff's misconduct during discovery, under Rules 37(c)(1) and 37(b)(2).  (Id. at 3-4).  Plaintiff's brief in opposition focuses primarily upon whether or not plaintiff had an obligation, during the interview and hiring process with defendant ICP, to divulge all of the circumstances of his employment with EDS.  (Doc. #76, at 1-9).  In the brief, plaintiff contends that "his employment with EDS ended through a negotiated settlement, not that he was fired or terminated for cause."  (Doc. #76, at 7-8).  As defense counsel point out in their reply brief, the pending motion concerns plaintiff misleading defendants and their counsel during discovery, not during the interview process.  (Doc. #77, at 1-2).

As summarized in Martinelli v. Bridgeport Roman Catholic Diocesan Corp., 179 F.R.D. 77, 80 (D. Conn. 1998):

> Rule 37 provides a non-exclusive list of sanctions that may be imposed on a party for failing to obey an order to provide or permit discovery. The mildest sanction is the reimbursement of expenses to the opposing party caused by the offending party's failure to cooperate, while the harshest sanction is the order of dismissal and default judgment.  While a showing of willful disobedience or gross negligence is required to impose a harsher sanction, a finding of willfulness or contumacious conduct is not necessary to support sanctions which are less severe than dismissal or entry of a default judgment.

(multiple citations omitted).  The Martinelli decision

10

continued: "The timing of discovery is as important as its content. . . . The plaintiff in this case had a right to the information in question when he requested it."  Id. at 81 (citation omitted).  Plaintiff is correct that the defendant's behavior in Martinelli was far different from that presented here, in that in Martinelli, the trial was suspended for a period to allow plaintiff's counsel to take additional depositions in New Jersey and California.  Id. at 78-79, 81-82.

The fact remains, however, that plaintiff's response to Interrogatory No. 4, on April 2, 2004, to the inquiry of whether he had ever been terminated, asked to resign, suspended or otherwise disciplined at a previous job was untruthful and/or grossly incomplete: "Suspended with pay from EDS during internal investigation surrounding one of my employees.  Cleared of all questions and reinstated with out discipline."  (Doc. #68, Exh. A, Plaintiff's Responses to Defendants' First Set of Interrogatories, at 2).  At the first session of his deposition, taken on June 17, 2004, plaintiff was questioned extensively on whether he had been terminated or asked to resign from EDS or any other employer, and his response was that he did not recall having been terminated or asked to resign.  (Doc. #68, Exh. B, at 81-82, 133, 136-37).  After consulting with his attorney, plaintiff

11

testified that he believed that he had resigned from EDS, but that he could not remember the specifics of his separation agreement with EDS.  (Id. at 133-35, 137, 142-43).  He could not recall having resigned in lieu of being fired.  (Id. at 136-37).  After this first session, defendant issued a subpoena to EDS and also deposed plaintiff's counsel regarding his communications with EDS.  (Doc. #68, at 7).  The letter from plaintiff's counsel, dated June 23, 2002, clearly reflects counsel's impression that plaintiff was on the verge of being terminated ("[u]nquestionably, [plaintiff] will be terminated shortly for 'poor performance'. . . ." and "[m]y client knows that his days are numbered at EDS. . . .").  (Doc. #68, Exh. C, at 2-3).  The two memoranda from EDS to plaintiff, dated August 1, 2002, specifically use the words "terminated" and "termination," as did the Settlement Agreement and Release between plaintiff and EDS.  (Doc. #68, Exhs. D & F).  At the second session of plaintiff's deposition, held on September 1, 2004, plaintiff continued to maintain that he had not been terminated or asked to resign by EDS, insisting instead that his exodus from EDS was not "a foregone conclusion" but merely "a possible potential scenario."  (Doc. #68, Exh. B, at 251-52, 275-77, 289-90).  It was only on January 26, 2005, some nine months after his discovery responses, in his affidavit and Local Civil Rule

56(a)(2) Statement, that plaintiff finally acknowledged that "EDS terminated my employment."  (Doc. #68, Exh. E, Affidavit of Raymond A. Capuano at ¶ 90, Plaintiff's Local Civil Rule 56(a)(2) Statement at ¶ 60).  And, finally, on cross-examination at trial on September 13, 2005, plaintiff testified that he had been involuntarily terminated from EDS ("Q.  Was your departure from EDS voluntary?  A. No.  Q.  So you were involuntarily terminated?  A.  I was terminated.").

Only the mildest sanction will be imposed, namely reimbursement of defense counsel for the time expended in establishing that plaintiff was terminated or asked to resign by EDS.  The time and expenses for which reimbursement is appropriate are as follows: (1) that portion of the June 17, 2004 deposition during which plaintiff could not recall having been terminated or asked to resign by EDS; (2) the expenses associated with the subpoena to EDS and the deposition of plaintiff's counsel; (3) that portion of the September 1, 2004 deposition during which plaintiff still maintained that he had not been terminated or asked to resign by EDS; and (4) the expenses associated with the pending motion.  Defense counsel's documentation of the attorneys fees and costs incurred in connection with the above tasks shall be filed **on or before October 6, 2005**; plaintiff shall respond **on or before October 20, 2005**; and defendants' reply, if any, shall be filed **on**

**or before October 27, 2005**.

**II.  Conclusion**

     Accordingly, for the reasons stated above, defendants' Motion for Sanctions (Doc. #67) is **granted to the extent set forth above**.

Dated at New Haven, Connecticut, this 15th day of September, 2005.

                                                      /s/
                                      Janet Bond Arterton
                                      United States District Judge